**David MACKEY, et al.**

v.

**JUDY'S FOODS, INC., et al.**

**No. 3–84–0108.**

United States District Court,
M.D. Tennessee,
Nashville Division.

Feb. 10, 1987.

Laurence M. Papel, Taylor, Schlater, Lassiter, Tidwell & Trentham, Raymond G. Prince, Nashville, Tenn., Thomas P. Malone, Minneapolis, Minn., for plaintiffs.

Tyree B. Harris, Dodson, Harris Robinson & Aden, Nashville, Tenn., Peter J. Nickles, Theodore Voorhees, Jr., William L. Saunders, Jr., Covington & Burling, Washington D.C., David M. Zolensky, also Mark H. Lynch, for defendants.

## MEMORANDUM

WISEMAN, Chief Judge.

The issues for decision are the Magistrate's recommendations, upon defendants' motion for summary judgment, that the Court dismiss plaintiffs' claims as barred (1) by the statutes of limitations, and (2) by the terms of a release agreement concluded in 1981 between the plaintiffs and Judy's Foods, Inc. The Court finds the Magistrate's Report and Recommendations to be well-reasoned and thorough. For the rea-

sons stated below, the Court adopts the Magistrate's conclusions that there are no unresolved genuine issues of material fact and that both the applicable statutes of limitation and the release agreement bar plaintiffs' claims as a matter of law. Defendants' motion for summary judgment, therefore, is granted.

### I. *Factual Background*

This is one of several cases that have arisen out of the Judy's hamburger franchising operation, which was headquartered in Nashville in the late 1970s and early 1980s. Plaintiffs Mackey, Dyer, and Dyer-Mackey Enterprises, an Alabama partnership, operated two fast-food franchises in Alabama until 1982. They have sued Judy's Foods, Inc. (hereinafter Judy's) and the other corporate and individual defendants [1] alleging breach of contract, a series of business torts,[2] intentional infliction of emotional distress, and violation of the Tennessee Consumer Protection Act, Tenn.Code Ann. § 47–18–110. Plaintiffs' theory in essence is that defendants fraudulently misrepresented the profitability of a Judy's franchise, fraudulently concealed the fact that a "retrofit" or redesign of the Judy's restaurants was required by the terms of a settlement of separate litigation between Judy's and Wendy's International, Inc.,[3] and fraudulently misrepresented their intentions toward continued development of the Judy's franchising network after HCA acquired the Judy's operation in 1979.

Defendants contend [4] that plaintiffs knew or should have known of the exist-

---

**1.** Other defendants are General Care Corporation, parent of Judy's and Hospital Corporation of America (HCA), which purchased Judy's and General Care in 1979. All are Tennessee corporations. The individual defendants, all Tennessee residents, were officers or directors of the defendant corporations. Jurisdiction is founded upon diversity of citizenship.

**2.** These counts of the complaint, 2 through 9, include breach of third party contracts, breach of fiduciary duty, continuing conspiracy, breach of duty of good faith in fair dealing, negligent misrepresentation, promissory estoppel, fraudulent misrepresentations, and fraudulent conceal-

ment. Defendants' motion on the statutes of limitation includes all claims except count 1, the breach-of-contract claim.

**3.** The thrust of the Judy's-Wendy's controversy was that Judy's had wrongfully copied Wendy's architectural, marketing, and promotional schemes.

**4.** Defendants have cited additional and possibly earlier points of accrual of plaintiffs' claims. Those enumerated are the points upon which either the parties or the Magistrate placed major emphasis in considering the statute of limitation issue.

ence of their claims against defendants: (1) at the very latest, in June, 1981, when they received a letter from Thomas M. Grammer, plaintiff in another lawsuit alleging fraud against Judy's et al.; (2) in November, 1980, when plaintiff Dyer attended a meeting of Judy's franchisees also attended by *inter alia*, three other franchisees and two attorneys already involved in litigation against the Judy's; (3) in mid–1980, when a series of three lawsuits[5] were filed against Judy's; or (4) as early as February, 1980, when an earlier meeting of franchisees was held in Kansas City, at which was formed a committee to discuss possible "legal action."

Plaintiffs contend in affidavits that, at least until February, 1983, they did not discuss details of the other lawsuits with other franchisees and did not know about the 1980 lawsuits. Shortly after they received the Grammer letter in June, 1981, plaintiffs say, they received misleading assurances from a Judy's official that the suit was "unfounded." Plaintiffs argue that any applicable statute of limitations was tolled by defendants' fraudulent concealment of the Wendy's-Judy's settlement and of other material facts until about February 14, 1983, when Dyer[6] acknowledges he learned of the verdict against Judy's in *Judico, Inc. v. Judy's Foods, Inc.,* No. 82–3194 (M.D.Tenn.1982).

Defendants further contend that, without reference to the statute of limitation, this action is barred by the terms of the Termination Agreement and Cross Release executed between plaintiffs and Judy's on November 9, 1981. In that agreement, for due consideration of some $2,600, the plain-

tiffs agreed to "hereby release[] Judy's from all claims for damages arising out of any agreement with Judy's relating to the establishment, equipping, and operation of Judys Restaurants and from all future obligations under any such agreement." Exhibit L to Defendants' Motion for Summary Judgment at 2.

Plaintiffs respond that a confidential relationship existed between franchisor and franchisees at the time Judy's secured this release, that the existence of this relationship imposed a duty on Judy's to disclose material facts to them, and that Judy's failed in this duty. Plaintiffs argue that the confidential relationship issue[7] both tolls the statutes of limitation and makes the release voidable.

## II. *Choice of Law*

In a diversity case, the District Court is obliged by the *Erie* doctrine to apply the law of the forum, including the forum's approach to choice of law. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Day & Zimmermann, Inc. v. Challoner,* 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975).

### A. *Substantive Law*

 Most of plaintiffs' claims sound in tort. *See* Part III, *infra.* Tennessee choice-of-law principles, thus, as the Magistrate correctly held, dictate that the law of the place of the tort would govern much of the substantive law of this case. *Great American Insurance Co. v. Hartford Accident & Indemnity Co.,* 519 S.W.2d 579

---

**5.** The three lawsuits were *J's Foods v. Judy's Foods, Inc.,* No. 3–80–379, filed May 22, 1980 (D.Minn.); *Ferrell-Little Enterprises v. Judy's Foods, Inc.,* No. 80–1705–III, filed Aug. 29, 1980 (Tenn. Chancery Court); and *Grammer v. Judy's Foods, Inc.,* No. 80–3534, filed Sept. 30, 1980 (M.D.Tenn.).

**6.** Dyer received from his brother a newspaper clipping reporting the December, 1982, jury verdict in *Judico* of $1.2 million against Judy's. As partners, both Mackey and Dyer are charged with knowledge acquired by the other.

**7.** Plaintiffs also contend that the release should be voidable because Judy's abused its fiduciary position by applying economic duress to secure it; the Court finds this contention without merit for the same reasons it rejects plaintiffs' other confidential-relationship agreements: the record of this case discloses that the release was the product of arms-length negotiations. *See* Dyer Deposition at 23–41; *Coral Gables Imported Motorcars v. Fiat Motors,* 673 F.2d 1234 (11th Cir.1982), *cert. denied,* 459 U.S. 1104, 103 S.Ct. 727, 74 L.Ed.2d 952 (1983).

(Tenn.1975); *Trahan v. E.R. Squibb & Sons, Inc.,* 567 F.Supp. 505, 507 (M.D.Tenn. 1983). When the tortious acts and the resulting injuries occur in separate states, Tennessee will apply the law of the state of injury. *Trahan,* 567 F.Supp. at 507. Thus, in a fraud case, the place of the wrong is where the loss is sustained, not where the fraudulent representations were made. *Bailey v. Chattem, Inc.* 684 F.2d 386, 392 (6th Cir.1982); Restatement of Conflict of Laws § 377, Note 4 (1934).

Alabama law, not Tennessee law, therefore will govern the substantive fraud issues in this case.

### B. *Statutes of Limitations*

█ The Magistrate correctly held that Tennessee courts apply the statute of limitations of the forum as a "procedural" measure unless the action (1) is one encompassed by the state borrowing statute, Tenn.Code Ann. § 28–1–112, or (2) is one in which the foreign state's limitation is not merely upon the remedy but upon the underlying substantive right. *Whitfield v. City of Knoxville,* 756 F.2d 455 (6th Cir. 1985); *McDaniel v. Mulvihill,* 196 Tenn. 41, 263 S.W.2d 759 (1953); *Bournias v. Atlantic Maritime Co.,* 220 F.2d 152 (2d Cir.1955). A statute of limitation in a foreign jurisdiction is held "substantive" only when it is built into the same statute that creates the cause of action in question or when the limitation, though appearing in a different statute, is "directed to the newly created liability so specifically as to warrant saying that it qualified the right." *Davis v. Mills,* 194 U.S. 451, 454, 24 S.Ct. 692, 694, 48 L.Ed. 1067 (1904); *see* E. Scoles & P. Hay, *Conflict of Laws* §§ 3.09–.10 (1982).

█ The Magistrate further was correct in holding that the plaintiffs' claims meet neither of the above criteria. First, Tenn. Code Ann. § 28–1–112 "borrows" another state's statute only to bar actions that accrue while the "party to be charged" is resident in the foreign state; all defendants here were and are Tennessee domiciliaries. Second, although Alabama has separate statutes that describe the action for fraud and set out a specific statute of limitations for fraud, neither is of a type to satisfy the *Davis-Bournias* criteria. Rather than creating a new right, the fraud statutes merely codify the pre-existing common-law action for fraud. Code of Alabama §§ 6–5–100 to –104; *Harton v. Belcher,* 195 Ala. 186, 70 So. 141 (1915). The fraud limitation statute, furthermore, is properly viewed not as a specific qualification of the right to sue for fraud but rather as a " 'saving provision,' which *extends* the time period for a right of action when there has been a fraudulent concealment." *Ryan v. Charles Townsend Ford, Inc.,* 409 So.2d 784, 786 (Ala.1981) (emphasis added); *see* Code of Alabama § 6–2–3.

Tennessee law, thus, will apply to determine the applicable statutes of limitation for all claims in this case.

### C. *The Release*

Plaintiffs executed the release agreement with Judy's in Nashville, Tennessee. If effective against all claims made in this case, the release would provide an absolute defense to the plaintiff's claims, most of which, as noted above, arise under Alabama law. Which law would Tennessee apply to govern the validity and effect of the release: the law of Tennessee, the locus of formation of the contract? Or the law of Alabama, the locus of the alleged torts that comprise the gravamen of the complaint against which the release would serve as a defense?

The Court has discovered no Tennessee cases that deal directly with this question. The parties appear to have ignored the issue or to have assumed[8] that Tennessee

---

**8.** Defendants noted that, "[u]nder Tennessee choice of law principles, the law of the place where the contract was signed applies in the absence of any statement specifying a different state." Defendants' Memorandum of Points and Authorities at 15. Plaintiffs merely argued, without expressing a view on which law would be applicable, that the law of *both* states makes voidable a release procured by fraud. Plaintiffs'

law would apply because the agreement was entered into here. The Tennessee approach to the choice of law applicable to contracts, however, dictates not a strict *lex loci contractus* approach but rather an inquiry into the intention of the parties.[9] Thus, rights and obligations of parties to a contract "are governed by the law of that state with the view to which it is made." The parties' intentions in this respect are "to be gathered from the terms of the instruments and all of the attending circumstances." *Ohio Casualty Insurance Co. v. Travelers Indemnity Co.*, 493 S.W.2d 465, 467 (Tenn.1973) (quoting *First American National Bank v. Automobile Insurance Co.*, 252 F.2d 62, 64 (6th Cir. 1958)).

The 1981 release agreement specified no law that would govern its validity or effect. Because the substantive rights of the plaintiffs that are affected by the release arise primarily under Alabama law,[10] an argument could be made that the parties' presumed intention was to conclude the agreement "with a view" to the laws of that state.

Indeed, it appears that a majority of courts that have considered the question have decided that the effect of a release asserted as a defense to a tort action is determined by the law that governs the substantive tort rights of the parties. *See, e.g., Western Newspaper Union v. Woodward*, 133 F.Supp. 17, 23 (W.D.Mo.1955) (Under Missouri law, the "validity, interpretation and effect" of a contract of release is governed "by the laws of the state that created or gave rise to the right thereby released."); *Bittner v. Little*, 270 F.2d 286 (3d Cir.1959) (Pennsylvania law); *Dice v. Akron, Canton & Youngstown R. Co.*, 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952) (FELA releases governed by federal law); *Kussler v. Burlington Northern, Inc.*, 186 Mont. 82, 606 P.2d 520 (1980); *see generally* 76 C.J.S. Release § 39. Courts have reached this result following both the "traditional" approach of the first Restatement of Conflict of Laws as well as the "modern" grouping-of-interests approach of The Restatement (Second). *Compare White v. American Motors Sales Corp.*, 550 F.Supp. 1287 (W.D.Va.1982) ("traditional" approach of Virginia law), *aff'd mem.*, 714 F.2d 135 (4th Cir.1983), *with Weddington v. Jackson*, 331 F.Supp. 1271 (E.D.Pa. 1971) ("modern" approach of Pennsylvania law).

As a "traditional" conflict-of-laws state, Tennessee appears particularly likely to follow the majority [11] law-of-the-tort approach to releases. Indeed, the law-of-the-tort approach has been identified with the "vested-rights" doctrine in conflict of laws. *See* Ehrenzweig, *Releases of Concurrent Tortfeasors in the Conflict of Laws: Law and Reason Versus the Restatement*, 46 Va.L. Rev. 712 (1960). The Tennessee Supreme Court has acknowledged that the vested-rights doctrine provides the "conceptual foundation" for its *lex loci* approach to the

Memorandum in Opposition to Motion for Summary Judgment at 29.

**9.** It is true, as defendants noted, that Tennessee courts have said that a contract is "presumed to be made with reference to the law of the place where it was entered into." *Deaton v. Vise*, 186 Tenn. 364, 210 S.W.2d 665, 668 (1948); *see also Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818, 821 (6th Cir.1977). This presumption, however, always is subject to qualification by a contrary intention of the parties. *See Deaton v. Vise, supra*, 210 S.W.2d at 668. That intention may be manifest by the terms of the contract or other attending circumstances. *Ohio Casualty Insurance Co. v. Travelers Indemnity Co.*, 493 S.W.2d 465, 467 (Tenn.1973). The presumption of *lex loci contractus*, thus, is not an inflexible rule but rather itself an inference regarding the

intent of the parties that governs in the absence of evidence to the contrary.

**10.** The Tennessee Consumer Protection Act claim arises obviously under Tennessee substantive law; the breach-of-contract claim probably would be governed by Tennessee law, the *lex loci contractus*.

**11.** *But cf. White v. American Motors Sales Corp.*, 550 F.Supp. at 1289–91 (applying law of the tort to *effect* of release but law of the place of execution to *validity* of release; Restatement (Second) of Conflict of Laws § 170, Comment b (apply law of the tort to determine effect of release on *non parties* to release agreement, but use choice-of-law principles for contracts to determine effect of release on *parties* ).

choice of substantive law in tort cases. *See Winters v. Maxey,* 481 S.W.2d 755, 756 (Tenn.1972).

■ It takes little extension of existing law, therefore, to predict that a Tennessee court would apply Alabama law—the law primarily governing the underlying substantive claims of the parties—to determine the validity and effect of the 1981 cross-release. The Court so holds.

### III. *Defenses*

#### A. *Statute of Limitation*

The Court has reviewed the record and studied the Magistrate's findings and conclusions. Like the Magistrate, this Court is mindful that the issues of discovery of a cause of action, fraudulent concealment, and confidential relationship usually present questions for the jury. *See Agristor Leasing v. Saylor,* 803 F.2d 1401 (6th Cir.1986); *Hill v. A.O. Smith Corp.,* 801 F.2d 217 (6th Cir.1986); *A & B Food Services Corp. v. Judy's Food, Inc.,* 798 F.2d 468 (6th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 460, 93 L.Ed.2d 405 (1986); and cases cited therein.

Even reading the record here in a light most favorable to the plaintiffs, however, this Court is compelled to agree with the Magistrate that the plaintiffs were put on notice of their claims against defendants by a series of events that culminated in the franchisees' meetings in February and November, 1980, which were attended by several attorneys for other franchisees *then in litigation* against the defendants. While plaintiffs have sworn in affidavits that they engaged in no conversations with others regarding the litigation, it is clear from plaintiff Dyer's notes from one meeting that he was aware of the existence of a "legal committee." The Court also notes that plaintiffs' counsel in this action was present at one of these meetings. Exhibits I and J to Defendants' Motion for Summary Judgment.

■ Under Tennessee law, a claim accrues when a plaintiff knows or reasonably should know that he has a cause of action against a defendant. A plaintiff is not permitted to wait, however, until he knows all of the injurious effects or consequences of a wrong. *Ameraccount Club, Inc. v. Hill,* 617 S.W.2d 876, 878 n. 1 (Tenn.1981). Rather, even when, as here, a plaintiff contends a statute should be tolled by fraudulent concealment or by the existence of a confidential relationship, the statute is tolled "only during the period when the plaintiff has no knowledge that a wrong has occurred, and, as a reasonable person is not put on inquiry." *Security Bank & Trust Co. v. Fabricating, Inc.,* 673 S.W.2d 860, 865 (Tenn.1983) (quoting *Hoffman v. Hospital Affiliates,* 652 S.W.2d 341, 344 (Tenn.1983).

■ The Court holds that no reasonable juror could find [12] that the plaintiffs were not put on notice by November, 1980 of their claims against defendants. This finding, thus, bars all claims except the breach-of-contract claim, for which there is a six-year limitation period under Tennessee law. Tenn.Code Ann. 28–3–109.

■ In Tennessee, the appropriate statute of limitation for a claim is determined by the gravamen of the complaint, which in turn is assessed by the type of injuries claimed and damages sought. The Magistrate correctly determined that the gravamen of Counts 2 through 9 of the complaint sounds in fraud. The appropriate limitation period for actions for fraud is the three-year limit on actions for damage to property, Tenn.Code Ann. § 28–3–105. *See Vance v. Schulder,* 547 S.W.2d 927 (Tenn. 1977); *Edwards v. Travelers Insurance Co.,* 563 F.2d 105 (6th Cir.1977).

Plaintiffs' claim for intentional infliction of emotional distress is properly characterized as an action for injury to the person and thus subject to the one-year period

---

**12.** The Court's view of the standard to be applied on summary judgment "mirrors" the standard for a directed verdict under Fed.R.Civ.P. 50(a). *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

——, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 213 (1986); *Celotex Corp. v. Catrett,* 477 U.S. —— ——, 106 S.Ct. 2548, 2252–53, 91 L.Ed.2d 265, 273–74 (1986).

specified in Tenn.Code Ann. § 28–3–104. *Harvey v. Martin,* 714 F.2d 650 (6th Cir. 1983).

Plaintiffs' Tennessee Consumer Protection Act claim is governed by Tenn.Code Ann. § 47–18–110, which requires that an action

> be brought within one (1) year from a person's discovery of the unlawful act or practice, but in no event shall an action be brought after four (4) years from the date of the consumer transaction giving rise to the claim for relief.

The Magistrate concluded that, because in this case "the consumer transaction occurred in 1978," plaintiff's action was barred. Report and Recommendation at 26. The Court notes, however, that the Act further defines "consumer transaction" to include:

> the advertising, offering for sale, lease or rental, or distribution of any goods, services or property, tangible or intangible, real, personal or mixed, and other articles, commodity, or thing of value wherever situated.

Tenn.Code Ann. § 47–18–103(8) (emphasis added). In view of this language, the Court accepts plaintiffs' objection that the Act would contemplate defendants' continued provision of franchise services as a continuing transaction. The defendants' alleged fraudulent practices, thus, would arguably have continued until November, 1981, when the parties ended their contractual relationship by entering into the release. All "transactions" in the four-year period between February, 1980 and February, 1984, when suit was filed, thus would escape the four-year bar. As the Magistrate also concluded, however, plaintiffs

fail to satisfy the statute's additional demand that action be brought within one year from discovery of the unlawful act or practice.

In summary, the Court holds that all claims except the breach-of-contract claim are barred by the appropriate Tennessee statute of limitation.[13]

### B. *The Release*

■ For the same reasons that the Court adopted the Magistrate's conclusion that no reasonable jury could find that plaintiffs should have discovered their cause of action later than November, 1980, the Court also concludes that plaintiffs cannot escape the effect of the release they signed a full year later in November, 1981. Moreover, without necessarily rejecting plaintiffs' argument that some degree of confidential relationship existed between the parties, the Court finds that the plaintiffs-businessmen were sufficiently on notice that they were surrendering their rights to sue for the injuries at issue in this lawsuit at the time they assented to the release. The Court notes particularly that, regardless of any assurances plaintiffs might have received from Judy's about the baselessness of the Grammer litigation, they were well aware of the details of the Grammer lawsuit five months before they agreed to waive their own rights.[14]

Under Alabama law, when the terms of a contract, including a contract of release, are unambiguous, the construction and legal effect of the contract become a question of law that, when appropriate, may be decided by the Court on summary judgment. *See Holland v. Continental Telephone Co. of the South,* 492 So.2d 998

---

**13.** The Court notes that the applicable Alabama law of constructive fraud and confidential relations cited by the parties to the Court is indistinguishable from Tennessee law. The Court's conclusions on when plaintiffs should have discovered their cause of action, thus, would be the same under either State's law. *See, e.g., Bank of Red Bay v. King,* 482 So.2d 274 (Ala.1985); *Soldano v. Owens-Corning Fiberglass Corp.,* 696 S.W.2d 887 (Tenn.1985).

**14.** It is undisputed that plaintiffs received a letter from Grammer in June, 1981 that detailed

many of the same alleged fraudulent practices of defendants of which plaintiffs complain in this lawsuit.

Plaintiffs have objected to the Magistrate's statement that, at the time of the release, the Wendy's-Judy's settlement and the settlement of the *J's Foods* lawsuit in Minnesota "were known." Report and Recommendation at 25. The Court does not rely upon this factual finding of the Magistrate as part of its reasoning.

(Ala.1986). The Court finds that the language of the release in the instant case is clear and unambiguous in releasing Judy's from "all claims for damages arising out of any agreement with Judy's." Exhibit L to Defendants' Motion for Summary Judgment.

There is an additional and compelling reason, not discussed by the Magistrate, why the release bars plaintiffs' claim. Plaintiffs have made no effort to return the $2,600 consideration they received as their benefit from the 1981 agreement.

It is a fixed feature of Alabama law that: when a contract for release has been induced by fraud, the party claiming fraud must restore the consideration he received under the contract within a reasonable time after discovering the fraud or he waives his right to assert fraud. The plaintiff may not retain the benefits of the release and at the same time attempt to evade its burdens.

*Boles v. Blackstock*, 484 So.2d 1077, 1083 (Ala.1986) (quoting *Jehle-Slauson Construction Co. v. Hood-Rich Architects & Consulting Engineers*, 435 So.2d 716, 719 (Ala.1983).

Because plaintiffs have made no attempt to return the consideration for the release, under Alabama law they have waived their opportunity to plead fraud in an attempt to rescind their contract.

## IV. *Conclusion*

The Court holds, therefore, that based upon full consideration of the record read in the light most favorable to the plaintiffs and drawing all inferences in their favor, no reasonable jury could find that they should not have known of the existence of their cause of action before November, 1980, or that they were fraudulently induced or coerced into signing the November, 1981 release. Moreover, under Alabama law plaintiffs have waived their right even to plead fraudulent inducement of the release.

Defendants' motion for summary judgment, therefore, is granted. An appropriate order shall issue.

## REPORT AND RECOMMENDATION

WILLIAM J. HAYNES, Jr., United States Magistrate.

## I. INTRODUCTION

This case was referred to the Magistrate by the Honorable Thomas A. Wiseman, Jr., Chief Judge, by Orders dated March 3, 1986, and June 2, 1986. The June 2, 1986, Order referred the case to the Magistrate for any necessary proceedings on pretrial issues, including Report and Recommendations on dispositive pretrial motions. On May 29, 1986, the Magistrate held a hearing on the defendants' motion for summary judgment.

The defendants' motion for summary judgment requests the Court to dismiss this action upon the grounds that plaintiffs' tort claims are barred by the Alabama statute of limitations and further that all plaintiffs' claims are barred by the release that plaintiffs signed in 1981. In support of the motion for summary judgment, defendants submitted a memorandum of law and several exhibits. Plaintiffs also submitted a memorandum of law in opposition to the defendants' motion for summary judgment with supporting exhibits. Further, after the hearing on the defendants' motion for summary judgment, plaintiffs were permitted to submit a supplementary brief in opposition to the defendants' motion for summary judgment to which defendants submitted a reply.

Plaintiffs, David Mackey, Joseph Dyer and Dyer-Mackey Enterprises, an Alabama partnership, bring this diversity action for alleged fraud, misrepresentation and breach of contract, arising out of plaintiffs' purchase of two Judy's Foods franchises. Plaintiffs are residents of Alabama and filed this diversity action on February 3, 1984, specifically alleging: (1) breach of contract; (2) breach of third party contracts; (3) breach of fiduciary duty; (4) continuing conspiracy by the defendants; (5) breach of duty of good faith and fair dealing; (6) negligent misrepresentation; (7) promissory estoppel; (8) fraudulent mis-

representation; (9) fraudulent concealment of material facts; (10) intentional infliction of emotional distress; and (11) violation of the Tennessee Consumer Protection Act of 1977.

The defendants are Judy's Foods, Inc.; General Care Corporation (hereinafter "GCC"), the parent company of Judy's Food, Inc.; and Hospital Corporation of America (hereinafter "HCA"), all Tennessee corporations. Also named as defendants are: Marvin P. Friedman, President, Chief Officer and Director of Judy's Foods, Inc.; Joel C. Gordon, Vice President of General Care; Charles N. Martin, Jr., director of Judy's Foods, Inc. and General Care; and William Bonham, Director of Training of Judy's Foods, Inc. All corporate defendants have their principal place of business in Tennessee and all individual defendants are residents of Tennessee.

## II. FINDINGS OF FACT [1]

1. The Dyer-Mackey-Judy's Relationship

On June 15, 1978, Mackey and Dyer signed a prospective license agreement for their first Judy's Food Restaurant (hereinafter "Judy's" or "restaurant") that opened for business on January 9, 1979. (Defendant's Exhibit M). It is unclear from the exhibits on this motion, the factual circumstances that led to Mackey and Dyer's investment in Judy's. On April 26, 1979, plaintiffs executed a release of all their franchise rights and claims under a prospective license agreement entered between Judy's and plaintiffs on June 15, 1978, for the sum of five thousand dollars ($5,000) and for an additional Judy's store in Baldwin, Alabama. (Defendants' Exhibit M). The first restaurant opened was not affected. *Id.*

Prior to June 19, 1979, Dyer lodged a number of complaints about Judy's operations, including the following inquiries:

1. What is Judy's doing about the distribution with the chicken?

2. *Why are there no new openings? Am I being left holding the bag never to get national advertising?*

3. *Why is it that I get customers telling me that Nashville's Judy's are in trouble?*

4. Why haven't you been more help to me in items such as food and paper cost and other controllable? I am having control problems and losing money. (emphasis added).

(Defendants' Exhibit K, a Memorandum dated June 19, 1979, to the Dyer file). Russ Wuerffel, an employee of Judy's, documented Dyer's questions and Wuerffel's responses to Dyer's questions. Dyer does not dispute this documentation.

On November 9, 1979, Donald MacNaughton, Chairman and Chief Executive Officer of HCA notified all franchisees in writing that HCA had reached an agreement with the defendant GCC, the parent company of Judy's, under which agreement, HCA would acquire all of GCC's common stock. HCA also informed all Judy's franchisees of HCA's plan to seek a suitable purchaser for the Judy's franchise system for a sale that would benefit all parties. (Plaintiffs' Exhibit 6).

Subsequently, on December 6, 1979, defendant Joel C. Gordon (hereinafter "Gordon"), then GCC Vice Chairman, wrote C. George Mercy, Sr., Vice President of HCA in reference to an earlier meeting held between the two corporations. (Plaintiffs' Exhibit 5). Included in this correspondence were references to Judy's that included: (1) the disposition of closed Judy's restaurants; (2) disposition of used equipment from closed Judy's restaurants; (3) remodeling of Judy's restaurants in Memphis to reflect the new Judy's, Judy's, Judy's image; (4) negotiations with franchisees for execution of releases of franchise rights and royalties; (5) provisions for offering assistance for retrofitting of Judy's franchisees; and (6) the suspension of all franchisee sales and recommendations without prior approval of HCA. *Id.*

---

**1.** These findings of fact relate only to those facts deemed necessary to resolve the defendants' motion for summary judgment based upon the statute of limitations and release contentions.

In December 1979, some Judy's restaurants were retrofitted or remodeled into a new design developed by Judy's. This retrofit program occurred after Wendy's International, Inc. (Wendy's) sued the defendants in June, 1978, in this Court for unlawful appropriation of Wendy's image. (Plaintiffs' Exhibit 1). In a memorandum to the file dated December 18, 1979, Mac Davis, defendants' counsel, noted that counsel for Wendy's met with him and defendants to discuss settlement of the Wendy's-Judy's litigation. (Plaintiffs' Exhibit 1). The Wendy's-Judy's litigation was settled in July, 1980. (Plaintiffs' Exhibit 8, p. 2).

In an agreement dated February 4, 1980, but signed by Dyer and Mackey in January, 1980, Dyer and Mackey agreed to an amendment to the September 15, 1978, License Agreement. (Defendants' Exhibit N). This amendment included, among other things, the Dyer and Mackey agreement to complete retrofitting of their Judy's restaurant and defendants' agreement to reimburse Dyer-Mackey for the retrofitting up to a maximum of twelve thousand dollars ($12,000). This latter reimbursement was to be accomplished by Judy's Foods, Inc.'s agreement to pay for the retrofitting by payment of Dyer-Mackey's out of pocket expenses for fees; payment of invoices, signs, and other such equipment; and reduction of Judy's service fees, derived from the restaurant gross sales, to one percent (1%) from four percent (4%). However, under the agreement, Dyer and Mackey would not be entitled to any reimbursement or reduction or refund of service fees during any period while in default. Significantly, Dyer and Mackey released the defendants from all actual or contemplated legal claims arising out of the sales of the Judy's licenses. *Id.*

Apparently, there was also a March, 1980 license agreement. On July 31, 1980, plaintiffs and defendants executed a third amendment to the License Agreement dated March 18, 1980, affecting the restaurant in Fairhope, Alabama. (Defendants' Exhibit O). This amendment was similar to the amendment executed in January, 1980.

Again, plaintiffs acknowledged the lack of any claim against the defendants arising out of the sale of the license and released the defendants from all claims.

3. Licensee hereby acknowledges that it has no claims against Licensor arising out of the sale of the license, the execution of the License Agreement, Licensor's performance under License Agreement, or the use of the System and hereby releases Licensor from any and all such claims.

4. This Amendment revokes and supercedes any previous amendment or modification of the License Agreement, formal or informal, and except as modified hereby the License Agreement remains in full force and effect.

(Defendants' Exhibit O, Court Document No. 27).

On January 21, 1980, John S. Haley (hereinafter "Haley"), co-owner of two Judy's franchises in Topeka, Kansas, notified "All Judy's Franchisees" that he had telephoned all Judy's franchisees and that all franchisees were in agreement that a meeting of Judy's franchisees should be held to discuss their problems with Judy's. (Defendants' Exhibit G). "The prime reason for the meeting [was] for [the franchisees] to become acquainted, freely discuss [their] collective problems and to discuss operational procedures." *Id.* Haley's notice informed all franchisees that a meeting would be scheduled for February 9, 1980 in Kansas City, Missouri. *Id.*

The minutes of the February 9th Kansas City meeting of Judy's franchisees reflect that Dyer and eighteen (18) other Judy's franchisee owners attended this meeting. (Defendants' Exhibit H). Other persons in attendance included Alan Zenkevich, and Tom Mulle, representatives from Judy's Foods, Inc. and private counsel for several Judy's investors. As a result of this meeting, three Committees were formed: 91) the New Products, Menu Diversification and Marketing Committee, (2) the Purchasing Committee and (3) "the Legal and Retrofit Committee." These committees were

formed to put grievances into writing "so that they [could] be answered directly by the company as to a yes oı a no." *Id.* After these three groups were formed, each committee then met separately at the meeting site. *Id.*

Dyer was named chairman of the Purchasing Committee. According to notes from the plaintiffs' files, Tommy Grammer was a member of the Purchasing Committee. (Defendant Exhibit I and Declaration of Mark Lynch). Alan Zenkevich and Tom Mulle were invited to the Purchasing Committee meeting. At this purchasing meeting, the questions that arose concerned principally the items used and sold in the franchise operations. The advantages of utilization of the Targeted Jobs Tax Credit Program were also discussed. *Id.*

Although Mulle and Zenkevich concluded that "the meeting was held for expressed purpose of trying to unify all the franchisees and to strengthen their position as Judy's franchisee," and that further, both "firmly [believed] that all the franchisees [wanted] to continue with Judy's and would like to see it become successful," neither Mulle nor Zenkevich were permitted to attend the meeting of the Legal Committee. *Id.* The Legal Committee included two attorneys.

### 2. Judy's Litigation

On or about May 22, 1980, the first Judy's franchise lawsuit, *J's Foods, Inc., et al. v. Judy's Food, Inc.* was filed in United States District Court in Minneapolis, Minnesota. This action alleged fraud in the sale and marketing of Judy's franchises against the same defendants in this action. (Defendants' Exhibit D). Exhibit D provides, in pertinent part:

> In connection with the offer and sale of the Franchises and the entry into the License Agreements, JUDY'S failed to state material facts necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading ...,

> \*    \*    \*    \*    \*    \*

> By engaging in the conduct described in paragraphs 24 and 26 above, defendant JUDY'S made or caused to be made untrue statements of material facts in applications, notices, reports and other documents filed with the Commissioner of Securities of the State of Minnesota and omitted to state in such applications, notices, reports and other documents material facts which were required to be stated therein ...

(Defendants' Exhibit D, pp. 6–7, ¶¶ 26–27). John Kubinski, one of the investors in J's Food, Inc., was a party in this action and attended the February 1980, meeting. It is noteworthy that Kubinski's attorney, Vernon J. Vanderweide, attended the February 9th franchise meeting held in Kansas City, Missouri and was a member of the franchisees' Legal Committee. (Defendants' Exhibit H).[3]

A second action, *Ferrell-Little Enterprise, Inc., et al. v. Judy's Foods, Inc., et al.*, was filed against the defendants in the Chancery Court, Davidson County, Nashville, Tennessee on August 29, 1980. (Defendants' Exhibit E). As in the first Judy's action, plaintiffs in this second action also asserted a claim of fraud against the defendants in the sale and marketing of Judy's franchises. Again, Jim Little, one of the plaintiffs in the *Ferrell* action also attended the February 9th franchise meeting in Kansas City and was a member of the Legal Committee. (Declaration of Alan Zenkevich and Exhibit I).

On September 30, 1980, the third lawsuit *Grammer v. Judy's Foods, Inc.*, was filed in United States District Court in Nashville, Tennessee. Plaintiffs in this action also alleged fraud in the sales and marketing of Judy's franchises. Moreover, these plaintiffs also were present at the fran-

---

**3.** Thomas P. Malone, now one of Dyer and Mackey's attorney in this action, was responsible for the day to day handling of Kubinski's lawsuit. Malone was an associate of the law firm of Wiese and Cox, LTD, that represented Kubinski. (Defendants' Exhibit J, p. 3).

chise meeting held in February, 1980.[4] Grammer was a member of the Purchasing Committee of which Dyer was chairman. (Defendants' Exhibit I and Declaration of Mark Lynch).

A second franchise meeting was held on November 4, 1980, in Nashville, Tennessee. The affidavit of Alan Zenkevich states that Dyer also attended this second franchise meeting. Dyer does not dispute Zenkevich's affidavit. In addition, John Kubinski along with his attorney, Vernon Vanderweide (plaintiff and attorney in the case *J's Foods, Inc., et al. v. Judy's Foods, Inc.;* James Little, one of the named plaintiffs in the case styled *Ferrell-Little Enterprise, et al. v. Judy's Foods, Inc.;* and Thomas Grammer, plaintiff in the case styled, *Grammer, et al. v. Judy's Foods, Inc.,* and Grammer's attorney, Alan Turk, also attended the meeting. Mr. Thomas P. Malone, Esq., who now represents the plaintiffs in this action also was present at this second meeting of the franchisees. (Defendants' Exhibit J).

On May 20, 1981, Thomas M. Grammer, franchisee of Judy's in the Campbellsville, Kentucky litigation, notified other Judy's franchisee owners, including Dyer and Mackey, of his pending lawsuit that was scheduled for a trial in federal court on July 1, 1981. (Defendants Exhibit B). Grammer "[requested] information from other franchise owners to [obtain] their opinions of how they were treated by Judy's Foods, Inc." In addition, Grammer wrote, "I would appreciate your support to help me prove that Judy's did not comply with their License Agreement." Also, Grammer attached a questionnaire with twenty questions relating to each franchisee's relationship with Judy's Food, including questions as to the franchisee's knowledge of the *Wendy's International*

*v. Judy's Foods, Inc.,* lawsuit; the impact of the lawsuit on the franchise business; whether the closing of Judy's company-owned stores hurt their franchise business; and whether Judy's Food had been open and honest with the franchise owners from the beginning until the present.

6. Do you know that Judy's Foods, Inc. has been open and honest with the franchise-owners from the beginning until the present time?

11. Were you aware of the Wendy's/Judy's lawsuit when you bought your franchise?

12. What did Judy's Foods, Inc. tell you concerning the lawsuit and how were you informed?

13. Do you think the Wendy's/Judy's lawsuit hurt your business? If so, how?

14. Do you think that the closing of Judy's company-owned stores hurt your business?

15. Did Judy's Foods, Inc. contact you when they had company-owned stores to close?

My lawsuit is scheduled for July 1, 1981, in Federal Court. However, Judy's has offered me $17,000.00 to settle out of court. I feel that with the support of other franchise owners we can win this case and at least get back what we have paid them.

\* \* \* \* \* \*

If you would like to contact my attorney for any additional information: ...

(Defendants' Exhibit B). Grammer requested that responses to the questions be returned as soon as possible. Finally, Grammer also inquired whether franchise owners would be willing to testify how they were misrepresented by Judy's Food, Inc. *Id.* Grammer listed his telephone

---

**4.** It should be noted that in an apparent response to these actions and franchisee complaints, defendant HCA sought counsel's advice. On November 19, 1980, William Waller, Jr., in a letter directed to Elliot Warner Jones, in-house counsel at HCA, advised Warner of the "probable consequences if Judy's Foods, Inc., were to sell its company-owned restaurants and simply go out of business leaving the franchisees to their own devices." (Plaintiffs' Exhibit 2). In short, Waller opined that Judy's had a continuing obligation under the franchise agreements to the franchisees and the franchisees were obligated to pay the continuing service fee. Hence, Waller concluded that Judy's should service the franchisees until a settlement could be negotiated with them on an individual basis.

number as well as the telephone number and name of his counsel. *Id.*

Shortly thereafter, on June 4, 1981, Carl George, Treasurer for Judy's Food then Judy's, Judy's, Judy's [5] mailed a response to Grammer's letter to Grammer and his attorney, Charles Patrick Flynn, with copies of the response to all franchisees. (Defendants' Exhibit C). George expressed disappointment with Grammer's letter of May 20, 1981, and stated that Grammer and his attorneys were "trying to intimidate Judy's Food, Inc. by generating additional unfounded lawsuits against [them]." Further, George noted that initially Judy's viewed Grammer's suit as "one of nuisance value" and offered to settle for five thousand dollars ($5,000) and later raised the offer to seventeen thousand dollars ($17,000). However, Grammer's letter noted that "with the support of other franchise owners we can win this case and at least get back what we have paid them." (Defendants' Exhibit B).

3. The Dyer-Mackey Releases

On November 9, 1981, Judy's Food, Inc., Dyer and Mackey executed a termination agreement and cross-release that superseded all prior agreements. (Defendants' Exhibit L). In this agreement, the parties terminated their licenses and amendments thereto and also released each other from all legal claims. Defendants agreed to allow Licensee (plaintiffs) the use of any names and marks of the system for the restaurants in Alabama through December 31, 1982. *Id.* The terms and consideration for the agreement were to remain confidential. The release provisions of this Agreement stated:

1. All prior agreements between the parties relating to the licensing, operation or retrofitting of restaurants using the Names and Marks and the System of Judy's are hereby terminated.

2. Notwithstanding the termination of such agreements, Judy's will make no objection to the use by Licensee of any of the Names and Marks or any part of the System for the following locations named below for a period through Dec. 31, 1982.

*Locations*

(1) 1111 Hwy. 31 S., Bay Minette, Alabama

(2) 400 Fairhope Ave., Fairhope, Alabama

3. Judy's hereby releases Licensee from all claims for monies owed or damages arising out of the establishment, equipping, and operation of Judy's Restaurants by Licensee under any agreement with Judy's and from all future obligations under such agreements.

4. Licensee hereby releases Judy's from all claims for damages arising out of any agreement with Judy's relating to the establishment, equipping, and operation of Judy's Restaurants and from all future obligations under any such agreement. Licensee further agrees to indemnify and hold Judy's harmless from all claims by third parties arising out of Licensee's operation of Judy's Restaurants.

(Defendants' Exhibit L).

Dyer in his deposition on May 14, 1986, stated that he became aware of the possibility of entering a release with defendants as a result of a conversation with Dan Holly, a franchise owner from Columbus, Georgia. Holly attended the franchise meeting held on February 9, 1980. (Dyer Deposition at 23). Zenkevich stated and Dyer does not dispute that Dyer contacted him seeking a termination of their franchise agreement. In addition, Zenkevich testified in his deposition that at the time of this release, Dyer was aware of other litigation against Judy's Foods, Inc. because Zenkevich told the plaintiffs. (Zenkevich's Deposition dated May 9, 1986, p. 9). However, Zenkevich was uncertain whether plaintiffs had knowledge of the Wendy's International, Inc. lawsuit and settlement. *Id.*

---

**5.** Apparently, Judy's Foods, Inc. in addition to its retrofitting campaign based on the lawsuit and settlement with Wendy's International, Inc. also changed its name to Judy's, Judy's, Judy's.

4. The Settlement of Judy's Franchise Litigation

On February 12, 1982, the Judy's franchisees in the Minnesota action in *J's Foods, Inc., et al. v. Judy's Foods, Inc., et al.*, Civil No. 3–80–379, settled and compromised their claims with defendants for a total of $975,000 in damages. (Plaintiffs' Exhibit 3). However, the provisions of the settlement agreement required plaintiffs and their attorneys to maintain as confidential all information respecting defendants. Further, plaintiffs agreed not to disclose the terms of the settlement, absent a court order. In addition, plaintiffs and their attorneys agreed prior to the closing date of the agreement to tender to defendants and their attorneys all files, records and documents and to erase all word processing recordings. (Plaintiffs' Exhibit 3).

On December 16, 1982, the *Tennessean* newspaper reported that Judy's Foods, Inc., HCA, and GCC had been found guilty by a federal court jury of intentional and willful fraud in the case *Judico, Inc., et al. v. Judy's, Foods, Inc.*. (Defendants' Exhibit A). Dyer, a resident of Alabama, received a copy of the Tennessee article from his brother who resides in Tennessee on or about February 14, 1983. According to Dyer and Mackey, the receipt of the article was the "first hint the plaintiffs had of the [illegal] scheme" involving the sale and marketing of Judy's franchises. (Plaintiffs' Memorandum for Summary Judgment at p. 7). Dyer expressly claimed that prior to receipt of the press clipping, he "was unaware of any facts or other information which would have [led him] to believe that the defendants had committed a fraud upon [him]." (Plaintiffs' Exhibit 7, Dyer's affidavit). After receipt of the Tennessee newspaper clipping, Dyer claimed that he immediately began to investigate the facts and circumstances surrounding the sale of Judy's franchises. *Id.* Mackey, in his affidavit, states that he was a silent partner in the operation of the two restaurants in Alabama and he did not involve himself in the daily operations of the business. (Plaintiffs' Exhibit 8). Similarly, Mackey asserts that he had no knowledge of any litigation against Judy's Foods, Inc., until about February 14, 1983, when Dyer telephoned him to apprise him of the Tennessee news clipping. *Id.* Plaintiffs filed this action against defendants on February 3, 1984.

III. CONCLUSIONS OF LAW

In the Magistrate's view, to determine the merits of defendants' motion for summary judgment, four legal questions must be resolved. First, the threshold issue is which state statute of limitations, Alabama or Tennessee, is applicable to the Mackey-Dyer claims. The second question is a two part issue: when did the Dyer-Mackey claim accrue and was this action filed within the relevant limitation period. Third, if the Mackey-Dyer claim is time barred, are there any factual circumstances that present a cognizable exception to the running of the statute of limitations on their claims under the applicable state law. The final issue is whether the parties' 1981 release bars the Mackey-Dyer claims in this action.

A. Is Tennessee or Alabama the Applicable State Law?

In this diversity action, Dyer and Mackey have alleged ten (10) tort claims. Dyer and Mackey are residents of Alabama and they operated their restaurants in Alabama. Thus, their injuries were suffered in Alabama. Defendants, however, are all Tennessee residents and corporations with their principal residences or places of business in Tennessee. Mackey-Dyer contends that the Tennessee's three (3) year statute of limitations governs and defendants contend that Alabama's one (1) year statute of limitations is controlling.

To determine which state's limitation period applies, Tennessee or Alabama, the controlling principles of the conflict of laws test must be examined. The basic rule in diversity cases is that a federal district court must apply the conflict of law rules of the forum. *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 494, 496,

61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Tennessee follows the general rule that statutes of limitations issues are procedural in nature and the resolution of such issues are controlled by the law of the forum, *McDaniel v. Mulvihill*, 196 Tenn. 41, 48, 263 S.W.2d 759 (1953), unless the issue involved is one of substantive law as distinguished from procedural law. *Sigler v. Youngblood Truck Lines*, 149 F.Supp. 61 (E.D.Tenn.1957). See also, *Bournias v. Atlantic Maritime Co., LTD*, 220 F.2d 152, 154 (2d Cir.1955). Thus, Tennessee follows the rules in the Restatement of the Conflict of Laws, as enumerated below:

§ 142. Statute of Limitations of Forum. (1) An action will not be maintained if it is barred by the statute of limitations of the forum, including a provision borrowing the statute of limitations of another state.

(2) An action will be maintained if it is not barred by the statute of limitations of the forum, even though it would be barred by the statute of limitations of another state, except as stated in § 143.

§ 143. "an action will not be entertained in another state if it is barred in the state of the otherwise applicable law by a statute of limitations which bars the right and not the remedy.[6]

Thus, under Tennessee law an action may be brought in Tennessee, if timely, even where such action would be barred by the statute of limitations of another state. The exception to this rule is where the other state's statute of limitation is substantive rather than procedural. Under Tennessee law and the Restatement, forum shopping can occur.

Two exceptions have been created to the general rule that the forum state's statute of limitations governs. The first exception created was by the Supreme Court in *The Harrisburg*, 119 U.S. 199, 214, 7 S.Ct. 140, 147, 30 L.Ed. 358 (1866). There, the Supreme Court held that a limitation period contained in a state wrongful death statute, was a substantive law, emphasizing that "the liability and the remedy were created by the same statutes, and the limitations of the remedy was therefore to be treated as limitations of the *rights.*" The rule in *Harrisburg* was extended later to any statute that also created a right unknown at common law. In *Davis v. Mills*, 194 U.S. 451, 24 S.Ct. 692, 48 L.Ed. 1067 (1904), the Supreme Court extended this judicial exception. Justice Holmes observed:

The common case [where limitations are treated as "substantive"] is where a statute creates a new liability, and in the same section or in the same act limits the time within which it can be enforced, whether using words of condition or not. *The Harrisburg*, 119 U.S. 199 [7 S.Ct. 140]. It is merely a ground for saying that the limitation goes to the right created, and accompanies the obligation everywhere. *The same conclusion would be reached if the limitation was in a different statute, provided it was directed to the newly created liability so specifically as to warrant saying that it qualified the right.* (emphasis added).

194 U.S. at 454, 24 S.Ct. at 694, 48 L.Ed. at 1070. Thus, even in the absence of a "built in" statute of limitations, a limitations period nonetheless may be considered substantive where it is contained in a different statute, so long as it is reasonable to conclude that the limitation is directed specifically to the statutorily created liability. Similarly, the Restatement Second, Conflict of Laws, states that "when the foreign limitation is intended to extinguish the right and not only to bar the remedy, it will be considered substantive." See also, Scoles & Hay, *Conflict of Laws*, 60 § 1982; Beale, *Conflict of Laws*, §§ 604.3, 605.1 (1935).

In the application of the judicial test to this case, an examination of the Ala.Code §§ 6–2–3 and 6–2–39 does not indicate that the "liability" and the "remedy" were created by the same statutes. The Alabama statute § 6–2–39 does not create the right of action for fraud. However, the statute

---

**6.** This is the "substance" versus "procedure" dichotomy.

does contain a provision limiting the time in which actions under the statute may be brought. The statute Alabama § 6–2–3 does not specifically qualify the time period for a fraud action. It is merely a saving provision which extends the time period for a right of action where there has been fraudulent concealment. *Ryan v. Charles Townsend Food, Inc.*, 409 So.2d 784 (Ala. 1981). Thus, Alabama Section 6–2–3 is not "directed to the newly created liability so specifically as to warrant saying that it qualifie[s] the right created by section 6–2–39. In this application of this judicial exception, the Magistrate finds that the statute of limitation question presents a procedural issue and thus, the Tennessee statute of limitation governs, unless the second statutory exception bars the application of Tennessee law.

The second exception to the application of forum law rule is the state "borrowing statutes" that are designed to discourage forum shopping. Under this exception, to determine whether the Alabama statute of limitation is applicable, Tennessee's borrowing statute, Tenn.Code Ann. § 28–1–112 (1980), must be examined. Tenn.Code Ann. § 28–1–112 provides as follows:

> Where the statute of limitation of another state or government has created a bar to an action upon a cause accruing therein, while the party to be charged was a resident in such state or government, the bar is equally effectual in this state.

It seems apparent that Tennessee's borrowing statute was enacted to preclude forum shopping, but the Tennessee statute does not apply "unless the bar became complete while the party to be charged was a resident of the foreign state." *Kempe v. Bader*, 86 Tenn. 189, 6 S.W. 126 (1887). See also, *Sigler v. Youngblood Truck Lines*, 149 F.Supp. 61 (E.D.Tenn.1957). Because the defendants are residents of Tennessee and the businesses are incorporated in Ten-

nessee, Tennessee's borrowing statute is inapplicable.

In sum, after a review of the statutes of limitations of Tennessee and Alabama, the Magistrate finds that both statutes are procedural. Because Tennessee follows the traditional rule that statutes of limitations that do not affect substantive rights are procedural, the Magistrate recommends that the District Court apply Tennessee's statute of limitations. See, *Whitfield v. City of Knoxville*, 756 F.2d 455 (6th Cir. 1985). See also, *Davis v. Mills*, 194 U.S. 451, 454, 24 S.Ct. 692, 683, 48 L.Ed. 1067 (1904); Beale, *Conflict of Laws*, § 603.1 (1935); Scoles & Hay, *Conflict of Laws*, § 3.8; *Restatement of Law, Second, Conflicts of Laws 2d*, §§ 603, 604 and 605. While the Magistrate finds that the Tennessee statute of limitations controls, the issues remain as to the applicable Tennessee statute of limitation, the date plaintiffs' claim accrued and whether this action was brought within the applicable statutory period.

**B. What is the Applicable Tennessee Statute of Limitation?**

In Tennessee, the applicable statute of limitations is determined according to the gravamen of the complaint at issue. *Carruthers Ready Mix v. Cement Masons Local Union*, 779 F.2d 320 (6th Cir.1985); petition for rehearing *en banc* denied, February 19, 1986. See also, *Vance v. Schulder*, 547 S.W.2d 927 (Tenn.1977); *Swauger v. Haury & Smith Contractors, Inc.*, 512 S.W.2d 261, 262 (Tenn.1974); *Carney v. Smith*, 222 Tenn. 472, 437 S.W.2d 246 (1969); *Brown v. Dunstan*, 219 Tenn. 291, 409 S.W.2d 365 (1966); The gravamen of Dyer and Mackey's complaint is fraud. (Court Document No. 1). Thus, Dyer and Mackey's claims are tort claims.

Tennessee sets a three (3) year limitation period on most of plaintiffs' torts claims, such as fraud.[7] Tenn.Code Ann. § 28–3–

---

**7.** If the District Court were to determine that Alabama law applies, the Magistrate notes that in January, 1985, the Alabama legislature repealed its prior law, Ala.Code § 6–2–39, that sets a two (2) year statute of limitation for fraud

actions based upon claims. In addition, Ala. Code § 6–2–3 had been amended at the time this action was brought. In 1985, Section 6–2–3 had been amended to provide that the statute of limitations for fraud is two (2) years after the

105 provides, in pertinent part, the following:

> Property tort actions—statutory liabilities—alienation of affections. The following actions shall be commenced within three (3) years from the accruing of the cause of action:
>
>> (1) Actions for injuries to personal or real property . . .

The Magistrate finds, however, that Dyer and Mackey's claim for intentional infliction of mental anguish or emotional distress is governed by the one year statute of limitation prescribed by Tenn.Code Ann. § 28-3-104(a). See, *Harvey v. Martin,* 714 F.2d 650 (6th Cir.1983); *Carney v. Smith,* 222 Tenn. 472, 477, 437 S.W.2d 246, 248 (1969).

### C. When did Plaintiffs' Claim Accrue?

As noted, the Magistrate finds that this District Court should apply the Tennessee statute of limitation for all of the alleged torts in this action. Inasmuch as the Magistrate finds that all of these torts except for the tort of intentional infliction of emotional distress are governed by the three year statute of limitations provided by Tenn.Code Ann. § 28-3-105, the issue now is to determine whether Dyer and Mackey commenced this action within three years from the accruing of the cause of action.

According to Mackey and Dyer, this action was filed on February 3, 1984, within one year after plaintiffs received the "first hint [that] of the scheme" of defendants. Plaintiffs based this "hint" on the news clipping received around February 14, 1983, from Dyer's brother.

Defendants contend that plaintiffs[8] were on notice as early as (1) July, 1979, when plaintiffs lodged grievances with Judy's; (2) December, 1979, when the restaurants were retrofitted; (3) January, 1980 when plaintiffs executed an amendment to the License Agreement; (4) when plaintiffs received notice from Grammer, a franchisee, regarding a franchise meeting scheduled for February, 1980; (5) November, 1980 at the meeting of franchisees held in Nashville, Tennessee that included franchisees who had filed lawsuits alleging fraud by Judy's; (6) July 30, 1980, when plaintiffs executed another amendment to the License Agreement; and (7) when the three lawsuits were filed in May, 1980, August, 1980, and September, 1980.

In *McCroskey v. Bryant Air Conditioning Co,* 524 S.W.2d 487 (Tenn.1975), the Supreme Court held that in an action for property damages under Tenn.Code Ann. § 28-3-105, a claim accrues and the statute

---

facts of the fraud are discovered by the aggrieved party. However, at the time this action was brought, Alabama required an action for fraud to be brought within one (1) year after discovery of the facts constituting the fraud. The Alabama Supreme Court has not applied the 1985 amendment to the statute of limitation to cases that arose prior to the effective date of the new statute. *Schoen v. Gulledge,* 481 So.2d 1094 (Ala.1985); *Miller v. SCI Systems, Inc.,* 479 So.2d 718 (Ala.1985). In a word, if Alabama law governs, Mackey and Dyer had one (1) year from discovery of the facts about the fraud to initiate this action.

**8.** Although it is contended that Mackey was a silent partner in the plaintiffs' Judy's franchises, Alabama substantive law would govern under Tennessee choice of law principles. Alabama has adopted the Uniform Partnership Act which states, in pertinent parts,

> An admission or representation made by any partner concerning partnership affairs within the scope of his authority as conferred by this act is evidence against the partnership.

> Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.

> Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his co-partners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.

Ala.Code § 10-8-51 (1985). Thus, under Alabama law, Mackey is bound by all acts or omissions of the plaintiff Dyer, his partner in the Mackey-Dyer partnership.

of limitation commences to run when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, a reasonable person should have discovered the claim. See also, *Roberts v. Berry*, 541 F.2d 607, 610 (6th Cir.1976) quoting *McCroskey* and *Prescott v. Adams*, 627 S.W.2d 134, 139 (Tenn.App.1981) (permission to appeal denied February 1, 1982). Subsequently, in *Stone v. Hinds*, 541 S.W.2d 598, 599 (Tenn.App.1976), the Tennessee Court of Appeals defined the statutory words "from the accruing of the cause of action" in Tenn.Code Ann. § 28–3–105, to mean from the time when plaintiff knew or reasonably should have known that a claim existed.

A more recent example of the time for the accrual of a cause of action under Tenn.Code Ann. § 28–3–105 occurred in *Harvey v. Martin*, 714 F.2d 650 (6th Cir. 1983), where it was held that a co-employee's statement that there was no basis for the Union's complaint that led to the plaintiff's termination should have placed plaintiff on notice of his claim for the wrongful inducement for a breach of his employment contract. There, the plaintiff contended that he was unaware of a potential wrongful inducement claim until after he had been ordered re-instated by an administrative tribunal.

The District Judge, Judge Morton, held that the claim for wrongful inducement to breach the contract was governed by Tenn. Code Ann. § 28–3–105 and found the claim was not timely. The Court of Appeals for the Sixth Circuit in a per curiam opinion affirmed, citing *McCroskey v. Bryant Air Conditioning*, 524 S.W.2d 487, 491 (Tenn. 1975); *Roberts v. Berry*, 541 F.2d 607, 610 (6th Cir.1976); *Prescott v. Adams*, 627 S.W.2d 134, 138 (Tenn.App.1981) and reiterated that the statutory words "from the accruing of the cause of action" meant from the time when the plaintiff knew or reasonably should have known that a cause of action existed. The Court concluded that as early as May, 1978, plaintiff had received a written statement from an employee, who stated that union members who signed the petition for plaintiff's removal did not know the basis for the alleged union complaint. The Court found that the plaintiff should have acted upon the co-employee's statement. Finally, the Court of Appeals in *Harvey v. Martin, supra*, noted that "although the Tennessee courts are hesitant to grant summary judgment when it is disputed as to when the plaintiff reasonably should have known that a cause of action existed" (citation omitted) the court held that the facts in that case revealed that the plaintiff failed to exercise care or diligence in an effort to ascertain whether he had a cause of action against the defendants.

The Court of Appeals noted that under Tennessee decisional law, "mere ignorance and the failure of the plaintiff to discover the cause of action is not sufficient to toll the running of the statute of limitations,"[9] citing *Hall v. DeSaussure*, 41 Tenn.App. 572, 580, 297 S.W.2d 81, 85 (1956). 714 F.2d at 653.

Under the facts in this case, it is undisputed that Dyer lodged grievances with defendants regarding problems with Dyer-Mackey Judy's franchise as early as January, 1980. More importantly, plaintiffs received actual notice in January, 1980, by letter from a Judy's franchisee and from a franchisee meeting that Dyer attended on February 4, 1980, in Kansas City, Missouri that there were legal problems with the Judy's franchise. The fact that Judy's Food representatives were excluded from the Legal Committee meeting undisputedly reflects the franchisee beliefs that their interests were potentially adverse to Judy's Foods, Inc. The Magistrate finds, first, that the formation of a "Legal Committee" clearly indicated to Dyer that they had potential legal claims against the Judy's Foods.

Moreover, after the February, 1980, meeting of the franchisees, in May, August and September 7, 1980, three lawsuits were filed by Judy's franchisees who attended the February, 1980 meeting. One of those

---

**9.** An exception to this rule exists as will be discussed later.

franchisees served on the Purchasing Committee of which Dyer was chairman. All of these complaints alleged fraud and false statements by Judy's and the defendants in this action.

Significantly, several of the franchisees and their attorneys in these three franchise lawsuits attended the second franchise meeting in November, 1980. Dyer and Mackey also were present at this meeting. Thus, the Magistrate finds that as of November 4, 1980, plaintiffs were in possession of sufficient facts to ascertain whether they had a cause of action. Therefore, the Magistrate finds November 4, 1980, to be the crucial date and if plaintiffs had any claim against the defendants, they were put on notice approximately three years and two months before this action was filed.

The Magistrate recognizes that upon a motion for summary judgment, the procedure is not to be a substitute for a trial of disputed factual issues. The burden is on the movant to show the absence of a genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. In addition, the Magistrate is obligated to view the evidence in the light most favorable to the opponent of the motion, including the benefit of every reasonable inference that can be drawn. *Taylor v. Nashville Banner Publishing Co.*, 573 S.W.2d 476, 480 (Tenn.App.1978). See also, *Harvey v. Martin*, 714 F.2d 650, 653 (6th Cir.1983). The Magistrate has attempted to give plaintiffs the benefit of every reasonable inference; however, under these facts, the Magistrate finds that plaintiffs failed to exercise care or diligence in an effort to determine whether they had a claim against the defendant after numerous notices of their potential claims.

In sum, because the Magistrate finds November 4, 1980, as the crucial date that plaintiffs' claims accrued, plaintiffs' tort claims are barred by the Tennessee statute of limitations.

### C. Whether Plaintiffs' Claim of Fraudulent Concealment Should Toll the Statute of Limitations

Plaintiffs' maintain that the running of the statute of limitations was tolled by the defendants' fraudulent concealment because the "defendants engaged in a continuing cover-up and took affirmative acts designed to mislead plaintiffs in this case from discovering their fraud." (Plaintiffs' Memo in Opposition to Defendants' Motion for Summary Judgment, p. 25). As previously stated, fraudulent concealment is an exception to the general rule that mere ignorance and failure of the plaintiff to discover the existence of a cause of action is not sufficient to toll the statute of limitations. *Stahl v. True*, Tenn.App. Slip Opinion (May 21, 1986). [Available on WESTLAW, TN-CS database]. See also, *Willis v. Smith*, 683 S.W.2d 682 (Tenn.App.1984), application for permission to app. den. January 22, 1985; *Dayco Corp. v. Goodyear Tire Rubber Co.*, 523 F.2d 389 (6th Cir. 1975); *Akron Presform Mold Co. v. McNeil Corp.*, 496 F.2d 230 (6th Cir.) *cert. denied* 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974).

Over a century ago, the Supreme Court in *Wood v. Carpenter*, 101 U.S. (11 Otto) 135, 139, 25 L.Ed. 807 (1879), articulated the standard for pleading fraudulent concealment where a party seeks to avoid the bar of the statute:

The fraud intended by the section, which shall arrest the running of the statute must be one that is secret and concealed, and not one that is patent or known. [citation omitted].

Further, the Court observed:

Whatever is notice enough to excite attention and put the party on his guard and call for inquiry, is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it. [citation omitted]. The presumption is that if the party affected by any fraudulent transaction or management might, with ordinary care and attention, have reasonably de-

tected it, he reasonably had actual knowledge of it.

*Wood v. Carpenter,* 101 U.S. (11 Otto) 135, 141, 25 L.Ed. 807 (1879). The Court explained that a party seeking to avoid the bar on account of fraud "must aver and show that he used diligence to detect it, and if he had the means of discovery in his power, he will be held to have known it." *Id.*

Dispelling any notion that concealment by silence would meet the test, the Supreme Court explained that "concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and inquiry." The Supreme Court posited further emphasis upon diligence by intimating that "there must be reasonable diligence, and the means of knowledge are the same thing in effect as knowledge itself." *Id.* Lastly, "the circumstances of discovery must be fully stated and proved, and the delay which has occurred must be shown to be consistent with the requisite diligence." *Id.*

In *Vance v. Schulder,* 547 S.W.2d 927 (Tenn.1977), the Tennessee Supreme Court adopted a similar standard, as espoused in *Wood* to toll the statute. The Court explained:

> To come within this exception, the plaintiff must prove that the defendant took affirmative action to conceal his cause of action and that he, the plaintiff, could not have discovered his cause of action despite exercising reasonable diligence. [citations omitted].

Articulating an analogous standard, the Court of Appeals for the Sixth Circuit observed:

> Under F.R.Civ.P. 9(b), the party alleging fraudulent concealment must plead the circumstances giving rise to it with particularity. Three elements must be pleaded in order to establish fraudulent concealment: (1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff[s] to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence un-

til discovery of the facts. [citation omitted].

*Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389, 394 (6th Cir.1975).

In applying these standards to the facts at bar, the Magistrate finds that plaintiffs' reliance on the fraudulent concealment exception is not justified. Undoubtedly the defendants did take some affirmative steps to conceal plaintiffs' claim, such as the defendants' failure to apprise plaintiffs of the Wendy's litigation in 1978 and settlement in 1980; defendants' failure to inform plaintiffs in November, 1980 of their plans to try and get releases from all parties; and defendants' concealment of the terms of the settlement and compromise in the *J's Foods* litigation, in February, 1982. However, plaintiffs undoubtedly could have discovered whether they had a cause of action well before November 4, 1980, if there had been an exercise of reasonable diligence. The 1980 Judy's litigation clearly revealed the Wendy-Judy's litigation. The terms of that J Foods' settlement was available through a Court order. Clearly, plaintiffs "had the means of discovery in their power," *Wood v. Carpenter,* 101 U.S. (11 Otto) 135, 141, 25 L.Ed. 807 (1879), and could have discovered their action if they had exercised reasonable diligence. Moreover, plaintiffs' on-going contacts with other franchisees gave plaintiffs the opportunity to learn the pertinent facts. Therefore, the Magistrate finds that Tennessee statute of limitations was not tolled by defendants' acts.

**D. Whether the 1981 Release Bars Plaintiffs' Claims**

Insofar as this is a diversity case controlled by Tennessee law, such law "requires that the termination of a contract by mutual consent of both parties be positive, clear and unambiguous, conveying an unquestioned purpose to terminate the contract." *Russom v. Insurance Co. of North America,* 421 F.2d 985, 992 (6th Cir.1970). In addition, as the Tennessee Supreme Court has opined:

[T]he scope and extent of a release depends on the intent of the parties as expressed in the instrument. A general release covers all claims between the parties which are in existence and within their contemplation; a release confined to particular matters or causes operates to release only such claims as fairly comes within terms of the release. [citations omitted].

*Cross v. Earls*, 517 S.W.2d 751, 752 (Tenn. 1974).

An examination of the 1981 release-agreement between the parties reveals that the terms of the release are "clear and cogent." *Cross v. Earls*, 517 S.W.2d at 751. The terms are a general release of all claims. This was the intent of both plaintiffs and defendants in executing the release. It is difficult to find that the release was obtained by fraudulent representation, when in May, 1981, plaintiffs were clearly placed on notice by the Grammer questionnaire of their viable legal claims against these defendants. While fraudulent representations constitute a ground for relief, *Rose v. Foutch*, 4 Tenn.App. 495 (1926); *Fisher v. Probart*, 6 Tenn. (5 Hayw.) 75 (1818); *Barnard v. Roane Iron Co.*, 85 Tenn. 139, 2 S.W. 21 (1886); *Clement v. Insurance Co.*, 101 Tenn. 22, 46 S.W. 561 (1898); *Shwab v. Walters*, 147 Tenn. 638, 251 S.W. 42 (1923); *Samuel v. King*, 158 Tenn. 546, 14 S.W.2d 963 (1929); *Crigger v. Mutual Benefit Health and Accident Ass'n*, 17 Tenn.App. 636, 69 S.W.2d 907 (1933); *Wright v. Fischer*, 24 Tenn.App. 650, 148 S.W.2d 49 (1940), in the instant case, at the time of the 1981 release, the Wendy's-Judy's settlement was known; the $950,000 settlement of the Minnesota action was known; and other Judy's franchisees were actually in litigation. Clearly, Mackey and Dyer at the time of this release had to be aware that they had potential legal claims similar to those of other Judy's franchisees. Dyer and Mackey's claims in this action are the same claims and against the same defendants as in the pending Judy's litigation. The availability of counsel who handled this litigation was made known to Dyer and Mackey by the Legal Committee, the Grammer questionnaire and the November, 1980, franchisee meeting that was attended by several franchisee counsel. By releasing all future claims, Dyer and Mackey also released their claims against these defendants.

### E. Plaintiff's Tort Claim of Intentional Infliction of Emotional Distress

As indicated earlier, a claim for intentional infliction of mental anguish or emotional distress is governed by the one year statute of limitations prescribed by Tenn.Code Ann. § 28–3–104(a). See, *Harvey v. Martin*, 714 F.2d 650 (6th Cir.1983); *Carney v. Smith*, 222 Tenn. 472, 477, 437 S.W.2d 246, 248 (1969). Because the Magistrate finds that the crucial date for discovery of plaintiffs' cause of action was November 4, 1980, plaintiffs' claim for intentional infliction of emotional distress is also barred.

### F. Tennessee Consumer Protection Act Claim

Tenn.Code Ann. § 47–18–110 (1985) provides, in pertinent part, the following:

Any action commenced under the provisions of this part shall be brought *within one (1) year from a person's discovery of the unlawful act or practice*, but in no event shall an action be brought after four (4) years from the date of the consumer transaction giving rise to the claim for relief.

In this case, the consumer transaction occurred in 1978, therefore any action the plaintiff might have under the Act is barred, *Johnson County, Tenn. v. U.S. Gypsum Co.*, 580 F.Supp. 284 (E.D.Tenn. 1984), because as stated above, Dyer and Mackey discovered their action as far back as November, 1980.

Finally, it should be mentioned that the Magistrate is cognizant that the Tennessee Courts are hesitant to grant summary judgment when it is disputed as to when the plaintiffs reasonably should have known that a cause of action existed.

*Prescott v. Adams,* 627 S.W.2d 134, 138–39 (Tenn.App.1981). See also, *Harvey v. Martin,* 714 F.2d 650 (6th Cir.1983). However, in the instant case, the Magistrate is confronted with an extensive record supplied by both parties and there appears no disputed issue of fact. The parties appear to differ as to the interpretation of these facts. Nevertheless, it seems apparent that plaintiffs failed to exercise diligence. Inasmuch as the statute of limitations is a statute of repose, the purpose of which is to compel the exercise of a right of action within reasonable time and to prevent undue delay in bringing suits, *Hackworth v. Ralston Purina Co.,* 214 Tenn. 506, 381 S.W.2d 292 (1964), the Magistrate finds that plaintiffs' claims are not timely.

## III. RECOMMENDATIONS

The Magistrate recommends that the defendants' motion for summary judgment be granted. Under Rule 72(b) of the Federal Rules of Civil Procedure, the plaintiff has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to this Recommendation, with the District Court. The defendants have ten (10) days from receipt of any objections filed to this Report in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).